1  Gerald L. Roylance
2  1168 Blackfield Way
3  Mountain View, CA 94040-2305

4  Phone 1-650-948-1790

**Filed**

MAY 6 - 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

### United States District Court
### Northern District of California, San Jose Division

| | |
|---|---|
| GERALD ROYLANCE, | Case No.: 5:13-cv-04258-PSG |
| Plaintiff, | FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF |
| vs. | 1. Telephone Consumer Protection Act |
| | 2. Unfair Business Practices |
| JOSEPH CARNEY; | 3. Unfair Advertising Practices |
| SEAN CARNEY; | |
| ENVIRONMENTAL SAFETY | |
| INTERNATIONAL, INC.; | |
| ENVIRONMENTAL PRODUCTS | |
| INTERNATIONAL INC.; | |
| SEPTIC SAFETY, INC.; | |
| D.J.C. HOLDING CORPORATION, A NEW | |
| JERSEY CORPORATION; | |
| DOES 1-200 | |
| Defendants | |

## I. **JURISDICTION AND VENUE**

1. **Jurisdiction**. Violations of 47 U.S.C. § 227 create federal question jurisdiction. Violations of California laws fall under supplemental jurisdiction.

2. **Venue**. Venue is appropriate in the Northern District of California because a substantial portion of the events occurred in this District.

1

First Amended Complaint for Damages and Injunctive Relief

3. **Intradistrict Assignment**. The San Jose Division is appropriate. Venue in Santa Clara County is proper under California Code of Civil Procedure § 395(b) because the allegations involve telephone communications to a residential telephone in Santa Clara County. Venue is also proper under California Code of Civil Procedure § 395(a) because the injury occurred in Santa Clara County.

## II. DECLARATION ON VENUE

4. Venue in Santa Clara County is proper under California Code of Civil Procedure § 395(b) because the allegations involve Telephone Communications to a residential telephone in Santa Clara County. Venue is also proper under California Code of Civil Procedure § 395(a) because the injury occurred in Santa Clara County. Venue is proper under California Civil Code § 1780(c) because a substantial portion of each transaction occurred in Santa Clara County.

## III. IDENTIFICATION

5. Plaintiff GERALD ROYLANCE is an individual residing in Mountain View, CA.

6. On information and belief, JOSEPH CARNEY is a resident of New Jersey who controls ESI. The Federal Communications Commission has identified him as the president of ENVIRONMENTAL SAFETY INTERNATIONAL, INC.[1]. On information and belief, he is an owner of ESI.

7. On information and belief, SEAN CARNEY is a resident of New Jersey who controls ESI. The Federal Communications Commission has identified him as the vice president of ENVIRONMENTAL SAFETY INTERNATIONAL, INC.[2] On information and belief, he is an owner of ESI.

8. On information and belief, RAY CARNEY is a resident of New Jersey. RAY CARNEY appears to be involved with product development and website advertising of the septic tank treatment. Plaintiff is ignorant of RAY CARNEY's involvement with the telephone calls in this complaint.

9. ENVIRONMENTAL SAFETY INTERNATIONAL, INC. ("ESI") is a New Jersey domestic profit corporation, filing number 0100783998. The incorporation was 9 June 1999. State records in 2013 gave its address as 685 Bergen Boulevard, Ridgefield, NJ. State records list associated names of "ENVIRONMENTAL PRODUCTS INTERNATIONAL" (type "FC"; no "INC" suffix) and "ENVIRONMENTAL PRODUCTS CORP" (type "PV"); state records also list an unspecified "NAME CHANGE" in 1999. Plaintiff is ignorant of the meaning of "FC" and "PV". "Activator 1000" is not

---

[1] FCC Citation, April 30, 2004, DA 04-1144, http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-04-1144A1.pdf.
[2] FCC Citation, April 30, 2004, DA 04-1144, http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-04-1144A1.pdf.

First Amended Complaint for Damages and Injunctive Relief

listed as an associated name.  JOSEPH CARNEY is the president, and SEAN CARNEY is the vice president.  As of 12 November 2013, its last annual report was filed 12 April 2011.  It gave its address as 43 Industrial Avenue, Fairview, NJ  07022 and its telephone number as 201-945-0018.  It also gave a telephone number of 800-505-8800.  On information and belief, "Activator 1000" is a trademark of ESI and possibly other Defendants.  On information and belief, this company is also known as "E. S. I., INC." On information and belief, the entity also uses the abbreviation "E. P. I. INC." "E. P. I. INC." gives its address as P.O. Box 397, Fairview, NJ 07022.  ESI and used the same telephone number (1-800-736-7337, which is 1-800-REORDER) as ENVIRONMENTAL PRODUCTS INTERNATIONAL INC.  The United States Postal Service stated that P.O Box 397 is held by ENVIRONMENTAL PRODUCTS INT'L INC., 216 Anderson Ave., Fairview, NJ 07022.  Dun & Bradstreet identify a company "E P I" at 420 Commercial Ave., Palisades Park, NJ.  Plaintiff now believes ESI and EPI are the same entity.

10.  Environmental Products International Inc. is a New Jersey profit corporation, filing number 0100120505.  The incorporation was 22 August 1980.  The corporation status was revoked on 8 February 1995 for failure to file an annual report for two years.  Its last annual report report was filed 4 September 1985.  It has no associated names.  The agent for service is Gilbert A. Craig.  This corporation now appears unrelated to the septic tank treatment.

11.  There is an E. P. I., INC. registered as a domestic profit corporation with the state of New Jersey, filing number 3736629300.  Plaintiff is ignorant of the relationship of this corporation to the defendants.

12.  SEPTIC SAFETY, INC. is a New Jersey profit corporation, filing number 0100393426.  The incorporation was 20 October 1988.  The corporation status was revoked on 5 April 1997 for failure to file an annual report for two years.  The last annual report was filed 7 September 2001 (after the revocation), but the records show the suspension was never lifted.  It has no associated names.  The principal place of business was 100 28th Street, Fair Lawn, NJ.  On information and belief, it also used the address 205 Anderson Ave, Fairview, NJ and the telephone number 201-313-0031.

13.  D.J.C. HOLDING CORPORATION, A NEW JERSEY CORPORATION, is a New Jersey profit corporation, filing number 0100617335.  The incorporation was 22 February 1995.  The corporation status was revoked on 1 June 2005 for failure to file an annual report for two years.  Its last annual report was 9 February 1999.  JOSEPH CARNEY is the president, and SEAN CARNEY is the

3

vice president. It has no associated names. On information and belief, its address is or was 216 Anderson Avenue Suite 3, Fairview, NJ; its telephone number is 201-313-0031. Dun & Bradstreet identified a "D.J.C. Holding Corporation" at 205 Anderson Ave, Fairview, NJ; a "DJC HOLDINGS CORP LTD" at 420 Commercial Ave, Palisades Park, NJ; a "DJC HOLDING CORP" at 340 Atlantic City Blvd, Bayville, NJ. On information and belief, D.J.C. HOLDING CORPORATION has also used the address PO Box 335, Palisades Park, NJ 07650[4].

14. Many defendants share telephone numbers, addresses, common control, and offer the same or similar products. As these entities appeared and disappeared, plaintiff is ignorant of how their valuable assets (such as customer lists and inventory) were distributed.

15. The companies and product names are confusing. In 1988, SEPTIC SAFETY, INC. was formed and apparently sold a product called "Septic Safety". The corporation was suspended in 1997. D.J.C. HOLDING CORPORATION shows up in 1995. ENVIRONMENTAL SAFETY INTERNATIONAL INC. shows up in 1999. In 2001, Oregon believes that D.J.C. HOLDING CORPORATION is doing business as SEPTIC SAFETY and selling a septic tank treatment with telephone solicitations. At some point on or before 2002, Joel Saunders of New Media Consulting apparently designs a website to sell a septic tank treatment called "Septic Care™"; one of the web pages identifies the company as DJC Products, 420 Commercial Avenue, PO Box 335, Palisades Park, NJ, 1-800-505-8800, djcholding@septiccare.com; it is not clear that the website is ever launched.[5] At some point around 1999, the other companies may have faded away and left only ESI/EPI, but the product name Septic Safety appears to have stayed around a little longer.

16. In June 2003, Missouri sues ESI for making calls to do-not-call numbers. In September 2003, Wisconsin sues ESI for making prerecorded calls to do-not-call numbers. The FCC receives complaints about prerecorded "Septic Safety" calls and cites ESI in 2004. Prerecorded calls offering "Septic Safety" apparently continue. New Jersey suspends D.J.C. HOLDING CORPORATION in 2005. The FCC issues its Notice of Apparent Liability in 2005. The FCC issues its Order of Forfeiture in 2006. On information and belief, prerecorded calls offering "Septic Safety" continue after the NAL. Around 2007, consumers start receiving prerecorded calls offering "Activator 1000" instead of "Septic Safety"; the Septic Safety brand is apparently abandoned. The calls also stop sending Caller ID information. Plaintiff receives such a prerecorded call in 2009 and ends up getting ESI's product.

---

[4] See, for example, http://www.arb.uscourts.gov/courtinfo/unclaimedfunds.pdf showing unclaimed funds of $29.38.
[5] https://web.archive.org/web/20020203164844/http://www.netreach.net/~joels/media/djc/contact.htm

First Amended Complaint for Damages and Injunctive Relief

17.  A shipment of "Activator 1000" involved the names "ENVIRONMENTAL PRODUCTS INT", "E. P. I. INC.", "ENVIRONMENTAL SAFETY INTERNATIONAL INC.", "ESI INC.", "ESI Products", and JOSEPH CARNEY.

18.  In its 2006 Order of Forfeiture against SEPTIC SAFETY, INC.[6], the Federal Communications Commission stated, "[Septic Safety, Inc., Environmental Safety International, Inc., DJC Holding Company, SAACA Industries, Inc., EPI Inc., and ESI Products] cannot escape liability for violations of our rule and orders simply by hiding behind a variety of company names."

19.  The name confusion continues.

20.  The website http://www.topseptictankcleaning.com states that its contents are "Copyright © 2014 | Septic Tank Treatment" – suggesting that Septic Tank Treatment is a company name.  The domain name was created 24 September 2009.  The website claims to have been in the septic tank treatment business for 20 years.  It claims a telephone number of 888-577-0072.  It states, "The bottom line is that if you need septic tank cleaning treatment for your home septic system, farm, company, school district, or your city municipality has waste water treatment issues that need professional attention, you need to contact Activator 1000 for the best custom technical superior engineered septic system treatment solutions at affordable wholesale prices.  Don't make the mistake of spending thousands replacing a good system when you can remedy the problem with a quality proven septic tank cleaning product from Activator 1000."  The statement suggests that "Activator 1000" is a company name. The "buy now" button on the website transfers to the website http://www.myactivator1000.com.

21.  The website http://www.myactivator1000.com states that its contents are "Copyright © 2014 | Activator 1000" – suggesting that Activator 1000 is a company name.  The website gives a telephone number of 888-577-0072.  The domain name was created 2 April 2010.  The registrant is the individual RAY CARNEY.  The registrant's address is 1358 Hooper Ave Ste 362, Toms River, NJ,[7] which is apparently a private mail box at The UPS Store #0763.

22.  An October 2012 press release[8] states, "Activator 1000, the innovative environmental company that manufactures, markets, and distributes, the only septic tank treatment product tested and approved by the U.S.D.A., has added a liquid septic tank cleaning formula to their product line."  The press release identifies RAY CARNEY as "the president of the development team at Activator 1000, and

---

[6] FCC, Order of Forfeiture, June 22, 2006, DA 06-1304, http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-06-1304A1.pdf, ¶ 8.
[7] The address should be 1358 Hooper Ave Ste D10 PMB 362, Toms River, NJ.
[8] http://www.pr.com/press-release/446081

creator of Myactivator.com."  The release further states, "MyActivator1000.com is an online retailer of all natural and environmentally safe septic tank treatment and septic maintenance products, an exclusive carrier of Activator 1000 septic cleaning products. For more than 20 years, Activator1000, is the only septic maintenance program tested and approved by the U.S.D.A., and also a member of the Better Business Bureau."

23.  A December 2012 press release[9] states, "MyActivator1000.com, a family owned environmental company that is responsible for developing, manufacturing, and retailing, the all natural septic tank treatment product Activator 1000, is adding a new all natural, septic tank odor control formula to their product line. The company's continuous ingenuity, since Activator 1000's first product released in 1988, has lead the way to the development of this new, more potent problem solving formula. Now in addition to Activator 1000 septic tank cleaning formulas, the company will sell Activator 1000 Odor Control Lemon Lime Formula, the first septic tank treatment product specifically designed to eliminate odors within just 30 days."

24.  The telephone number 888-577-0072 is answered as EPI.

25.  Plaintiff is ignorant of the company Activator 1000, which may not be the same Activator 1000 as in 2009; it appears to be the strongly tied to ESI if not ESI itself, but it could be something else.

26.  The true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 to 200, inclusive, being unknown, Plaintiff sues these Defendants under fictitious names pursuant to Code of Civil Procedure § 474.  Plaintiff is informed and believes and thereon alleges that each Defendant named in this complaint is in some manner responsible for the wrongs and damages as alleged below, and in so acting was functioning, at least at times, as the agent, servant, partner, and/or employee of the Defendants, and in doing and/or not doing the actions mentioned below was acting within the course and scope of his or her authority as such agent, servant, partner, and/or employee with the permission and consent of the other Defendants.

## IV.   FACTS COMMON TO ALL CAUSES OF ACTION

### A.  Plaintiff's Relationship to Defendants

27.  Plaintiff's residential telephone number is 650 948-1790.  The residential telephone directory lists the number under the name G. Roylance.

---

[9] http://free-pr-online.com/2012/12/all-new-activator-1000-odor-control-formula-septic-tank-treatment/

First Amended Complaint for Damages and Injunctive Relief

Case 5:13-cv-04258-PSG   Document 29   Filed 05/06/14   Page 7 of 22

28. Plaintiff did not have a business relationship with any Defendant prior to the prerecorded call.

29. Plaintiff has not given any Defendant prior permission or prior express consent to transmit prerecorded messages to his telephone, 650 948-1790.

30. If Plaintiff did have a business relationship with any Defendant or had expressed consent for prerecorded calls, that relationship or consent was terminated by do-not-call requests.

### B. The Business

31. On information and belief, the Defendants develop, market, and/or sell septic tank treatments.

32. On information and belief, ESI would be relatively small with a dozen or so employees; the CARNEYs, as managers of ESI, would know what was happening throughout the business and have participated in the actions or failures to act. They would know about major problems within ESI and would be responsible for fixing them. After 3 episodes with the FCC, plaintiff still received a prerecorded call that led to an ESI product – exactly the product mentioned in the prerecorded call.

33. The septic product needed sales, and one of the sales channels, perhaps the primary one, became telephone solicitations. ESI apparently settled into doing some inexpensive prerecorded sales calls. Although illegal, such calls would seldom trigger lawsuits, but they would find customers and are inexpensive because there is little labor cost. The CARNEYs and ESI might be relatively innocent at that point. Prerecorded calls to residences were permitted by FCC regulations if the calls did not include an unsolicited advertisement, and several people believed "information-only" calls about commercial products were permissible.

34. The state and FCC actions would be big problems for ESI, and they should trigger a review of the firm's telemarketing practices and could have a major impact on the budget. If the prerecorded calls were being done in house, then the practice should be stopped. If vendors were being used, then the CARNEYs and ESI should terminate or otherwise remedy them. Plans for handling the diminished sales or higher sales costs would have to be made.

35. The CARNEYs' reaction does not seem ideal because ESI apparently ignored an investigation demand and otherwise did not work with the states. The business starts using the SODDI defense: JOSEPH CARNEY claimed that competitors were using its name, but that defense rings hollow when somebody actually buys the product and it comes from ESI as apparently happened in Wisconsin.

36. A similar thing happened when the FCC cited ESI for prerecords. At first, ESI did not bother to respond.

7

First Amended Complaint for Damages and Injunctive Relief

37.  The FCC saw more prerecorded calls, so the FCC issued the Notice of Apparent Liability.

38.  ESI resonded this time.  JOSEPH CARNEY repeated the SODDI defense to the FCC, but the FCC did not buy it because more septic treatment complaints came in, and the FCC found CARNEY's SODDI story inconsistent.

39.  On information and belief, the FCC Forfeiture Order was not enough to cause ESI to stop its prerecorded calls.  Social media was on the rise, and websites started tracking telemarketing calls.  These websites would index calls by Caller ID number, and ultimately there would be posts that linked septic tank treatment prerecords to the FCC's ESI forfeiture.  That may have damaged the Septic Safety brand enough for ESI to seek a new brand.

40.  Then, in 2009, plaintiff receives a prerecorded call for Activator 1000 without Caller ID; he buys the product, and the product comes from ESI – not an ESI competitor.  Plaintiff writes a letter to return the product, and that letter is answered (ESI wants its product back).  Plaintiff writes a demand letter, and the CARNEYs do not answer it.  After multiple complaints about prerecorded call violations, the managers cannot simply ignore them.

41.  If the ESI prerecords did not stop (as the above implies), then the best inference is management was ineffective at stopping the calls or at worst is management deliberately continued the calls.  Such an action would also financially benefit both owners and high ranking managers.

42.  Telemarketing companies are agents of their principals.  Telemarketers enter into contracts on behalf of their principal.  The telemarketer has bound the principal to a contract.  The telemarketer has represented the principal to third persons.

43.  Principals are responsible for the business torts of their telemarketers.

44.  Principals have a nondelegable duty to obey telemarketing statutes.

### C. Oregon Department of Justice

45.  The Oregon Department of Justice, in a December 10, 2001 media release about do-not-call violations,[10] stated that "DJC HOLDING COMPANY of New Jersey, doing business in Oregon as Septic Safety, was named in an order to enforce compliance of an investigative demand.  During a Justice investigation, the company refused to sign a settlement agreement and ignored a civil investigative demand. Under a Linn County Circuit Court order, the company is stopped from

---

[10] AG Files Actions Against No Call Violators; Reminds Consumers of December 15 Deadline to Register, December 10, 2001, http://www.doj.state.or.us/releases/2001/rel121001.shtml

First Amended Complaint for Damages and Injunctive Relief

1   telemarketing or accepting payment for business obtained through telephone solicitation in Oregon."

### D.  Missouri Attorney General

46.  In June 2003, the Missouri Attorney General obtained a court order requiring ENVIRONMENTAL SAFETY INTERNATIONAL INC. to pay $5000 for marketing septic tank products in violation of Missouri's do-not-call law.

### E.  Wisconsin Attorney General

47.  Wisconsin instituted a state-wide do-not-call list.  On information and belief, Wisconsin residents on that list received prerecorded calls offering a septic tank treatment; 26 Wisconsin residents complained about such calls; when a resident purchased the product, the product came from ENVIRONMENTAL SAFETY INTERNATIONAL INC.  ESI also had not registered with the state as a telemarketer.

48.  Before suing, the attorney general's office sent ENVIRONMENTAL SAFETY INTERNATIONAL INC. formal notice of the do-not-call violations, but ESI did not work with the state to resolve the complaints.  Consequently, the state sued ENVIRONMENTAL SAFETY INTERNATIONAL INC. d/b/a East West Marketing Inc on 29 August 2003.  JOSEPH CARNEY denied the allegation by claiming that other companies were using ESI's name.

### F.  Action by the Federal Communications Commission

49.  In 1991, Congress passed the Telephone Consumer Protection Act (TCPA).  The TCPA prohibited the use prerecorded calls for unsolicited advertisements and allowed for do-not-call lists.  The Federal Communications Commissions ("FCC") has jurisdiction to create regulations and enforce telemarketing violations.  Congress suggested a national do-not-call list, but the FCC's 1992 regulations only created a company-specific do-not-call list.  Several states adopted state-wide do-not-call lists, and in July 2003 the FCC imposed a national do-not-call list (68 FR 44177 July 25, 2003).

50.  On information and belief, the FCC received complaints about prerecorded telemarketing by ENVIRONMENTAL SAFETY INTERNATIONAL, INC. and other Defendants.

51.  The FCC issued a citation on April 30, 2004.  The document number is DA 04-1144.  The citation was directed to ENVIRONMENTAL SAFETY INTERNATIONAL, INC. a/k/a Environmental Products International a/k/a Septic Safety, Inc. a/k/a DJC Holding Company a/k/a SAACA Industries, Inc. a/k/a EPI, Inc. a/k/a ESI Products.  The citation was attention to JOSEPH CARNEY and SEAN

First Amended Complaint for Damages and Injunctive Relief

CARNEY.  The citation was for one or more prerecorded messages to a residential telephone line in violation of 47 U.S.C. § 227(b)(1)(B).  A complaining letter from Gerald Baldwin and four other consumer complaints were attached to the Citation.[11]

52.  Consequently, JOSEPH CARNEY and SEAN CARNEY were aware of prerecorded calls being used to solicit the septic tank treatment.

53.  ESI, JOSEPH CARNEY, and SEAN CARNEY did not respond to the citation.

54.  Reasonable officers would investigate the claims and take steps to correct the problems.

55.  On information and belief, after the citation, the FCC received additional "Septic Safety" complaints about prerecorded telemarketing by ESI.

56.  The FCC adopted a Notice of Apparent Liability for Forfeiture ("NAL") on February 2, 2005.[12] The target was SEPTIC SAFETY, INC.  The NAL stated that "Septic Safety" also does business as "Environmental Safety International, Inc.", "Environmental Products International", "DJC Holding Company", "SAACA Industries, Inc.", "EPI, Inc.", and "ESI Products".  The NAL was for willfully or repeatedly violating the TCPA by delivering at least two unsolicited prerecorded advertising messages to two consumers.  The NAL was for $14,500.

57.  JOSEPH CARNEY wrote a letter to the FCC on behalf of ESI.  CARNEY argued that SEPTIC SAFETY, INC. and D.J.C. HOLDINGS were no longer in business; CARNEY stated that he had been selling septic tank treatment products under the names of ENVIRONMENTAL SAFETY INTERNATIONAL, INC. and "ENVIRONMENTAL PRODUCTS".  The former was in Ridgefield, NJ, and the later was in Toms River, NJ.  CARNEY alleged that competitors used the name "Septic Safety".

58.  CARNEY responded to the NAL by claiming the call in the Cusick complaint was intended for Ms. Linda Peek.  As to the Keehner complaint, ESI admitted it called Mr. Keehner in November 2004 but denied it called Keehner in July 2004.  ESI asked the FCC to rescind the forfeiture.

59.  After CARNEY's letter and response to the NAL, the FCC continued to receive consumer complaints about "Septic Safety" prerecorded calls.  Ben Banks alleged receiving such a prerecorded call on 26 June 2005, and Leonard Ledoux alleged receiving such a call on 19 March 2006.

60.  The FCC rejected ESI's claim that it no longer does business under the name "Septic Safety".

61.  The FCC rejected ESI's claim that competitors were masquerading as "Septic Safety".  The FCC pointed out that ESI admitted making one call to Mr. Keehner, and Mr. Keehner identified that call

---

[11] NAL, footnote 6.
[12] FCC, February 2, 2005, Notice of Apparent Liability, DA 05-287, http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-05-

First Amended Complaint for Damages and Injunctive Relief

as a prerecorded, unsolicited advertisement from a company that identified itself as Septic Safety.

62. The FCC adopted an Order of Forfeiture on June 22, 2006.[13] The document number is DA 06-1304. The order identified additional business names of "EPI" and "EPIU". The amount of the forfeiture was reduced to $9,000.

63. Although CARNEY claimed that ESI obeyed do-not-call rules, he apparently did not deny the use of prerecorded calls. The FCC stated, "the use of prerecorded advertising or solicitation messages is unlawful under most circumstances, even if the recipient has not made a do-not-call request."

64. The FCC established that ESI was using prerecorded solicitations with the name Septic Safety.

65. JOSEPH CARNEY and SEAN CARNEY declared that ESI had altered its policies to follow the law after the FCC incident.

### G. Prerecorded Call to Plaintiff on September 14, 2009

66. On September 14, 2009, plaintiff received a prerecorded message on his residential telephone line (the "first call"). The message was about a septic tank treatment called "Activator 1000". The call only used the name "Activator 1000". The message was:

> "Hello. This is a special notification for local septic tank owners about avoiding environmental damage and saving money. If your home is served by a septic tank, please take a few seconds to hear this important message. The US Department of Agriculture has tested and approved a new product which eliminates costly pumping out of septic tanks, keeps leach fields clear, and keeps septic tank systems working efficiently for just pennies per month. The product is called Activator 1000, and it is completely safe for the environment, including kids, pets, plants, and plumbing systems. Activator 1000 includes a one hundred percent money back guarantee of results and satisfaction, is USDA approved, and is now available here. If you would like to request free information on Activator 1000, of course at no cost or obligation whatsoever, first please just say yes after this tone. [Tone]"

67. The prerecorded message did not provide any company name. The FCC requires "All artificial or prerecorded telephone messages shall: (1) At the beginning of the message, state clearly the identity of the business, individual, or other entity that is responsible for initiating the call. If a business is responsible for initiating the call, the name under which the entity is registered to conduct business with the State Corporation Commission (or comparable regulatory authority) must be stated". (47 C.F.R. §

---

287.A1.pdf.
[13] FCC, June 22, 2006, Order of Forfeiture, DA 06-1304, http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-06-1304.A1.pdf.

First Amended Complaint for Damages and Injunctive Relief

64.1200(b).)

68. The prerecorded message did not include a telephone number or a street address: "During or after the message, state clearly the telephone number (other than that of the autodialer or prerecorded message player that placed the call) of such business, other entity, or individual." (47 C.F.R. § 64.1200(b)(2).)

69. The name "Activator 1000" was in a different voice than the rest of the message. On information and belief, the message was similar to earlier prerecorded telephone messages used for the product "Septic Safety" except that it was sound edited to replace "Septic Safety" with "Activator 1000". A transcript for an earlier "Septic Safety" call is on the web[14]:

> "Hello, this is a special notification for local septic tank owners about avoiding environmental damage and saving money. If your home is served by a septic tank please take a few seconds to hear this important message. The US Department of Agriculture has tested and approved a new product which eliminates costly pumping out of septic tanks, keeps leech fields clear, and keeps septic tank systems working efficiently for just pennies per month. The product is called Septic Safety, and it is completely safe for the environment including kids, pets, plants and plumbing systems. Septic Safety includes a one hundred percent money back guarantee of results and satisfaction, is USDA approved, and is now available here. If you would like to request free information on Septic Safety, of course at no cost or obligation whatsoever, first please just say yes after this tone. Tone"

70. The stark similarity of the above messages has bad implications for the CARNEYs and ESI. In one scenario, ESI has the original audio, edits it, and then start broadcasting the new message; it continues a bad practice. In the other scenario, ESI had a vendor who used prerecords, and the CARNEYs and ESI ratified that vendor's methods by continuing to use the vendor.

71. The Caller Id information for the prerecorded call was "Out of area" without a telephone number at 7:23PM.

72. A live person did not identify the company, introduce the prerecorded message, and ask permission to play the recording.

73. The prerecorded message was an unsolicited advertisement. It was part of an overall plan or marketing campaign to sell property, goods, or services. Its goal was to sell a septic tank treatment.

---

[14] See http://pages.sbcglobal.net/antitm/fcc_citations.html, which gives a transcript using "Septic Safety". Compare to transcripts published on Nov 28, 2007 by "anon" at http://whocallsme.com/Phone-Number.aspx/2019452119 and by "joebanks" at http://800notes.com/Phone.aspx/1-201-945-2119/2.

First Amended Complaint for Damages and Injunctive Relief

74.  Plaintiff's residence has a sewer connection; it does not have a septic tank.  Plaintiff did not need the product, but plaintiff did want to identify the anonymous caller.  In order to identify the caller, plaintiff said "yes", which was the only option to proceed further.  He was then asked to state and spell his last name, which he did.  The automated caller thanked plaintiff, said goodbye, and hung up.

75.  Plaintiff was not asked for his telephone number.  Plaintiff was not given more information during that call after he said "yes"; he was not transferred to a live agent.  He was not asked for his mailing address.  He was not asked if someone could call back later.  It was the caller's decision to hang up and make another telemarketing call later.

76.  Unsolicited prerecorded calls are illegal under both state and federal law.  The caller apparently knew that prerecorded calls were illegal; in an effort to frustrate complaints, the caller did not supply the name of the caller or the entity on whose behalf the call was made.  The message did not supply a telephone number.  The call suppressed Caller ID.

77.  Legitimate advertisers want the public to know their name and how to contact them.

78.  On September 15, 2009, plaintiff received a live call about "Activator 1000" (the "second call").  The caller said he was Dan Taylor.

79.  Taylor claimed the company name was Activator 1000, but plaintiff did not believe it to be an actual company.  Activator 1000 was identified as the product name in the prerecorded message; it does not sound like a company name.  Taylor did not identify ESI.  Taylor stated the company had been in business since 1984.

80.  The Caller Id information was Out of area, 732-606-8120, 4:32PM.  The area code and exchange are for Toms River, NJ.

81.  The offer was for a four-year supply of a septic tank treatment; the price was $189.90.  Although the prerecorded message claimed the cost would be "just pennies per month", the cost is $3.96 per month.

82.  In order to identify the caller, plaintiff placed an order.  Plaintiff was told he would be billed and would not have to pay first.  Taylor told plaintiff the shipping department would call in a couple of minutes.  It is not clear why Taylor could not have finished the order or simply transferred the call to the shipping department.  It was the caller's choice to terminate the call and make another call.

83.  A few minutes later, the phone rang, and plaintiff quickly answered it (the "third call").  Plaintiff then realized that Caller ID information may not have come through yet, so he hung up.  The CID information did come through: it was Out of area, 1-732-606-8111, 4:44PM.  Plaintiff is not

13

1   seeking damages for the third call.

2   84. A couple minutes later, there was another call (the "fourth call"); the CID was Out of area, 1-732-606-8111, 4:46PM. The shipping department offered a $15 discount if plaintiff paid with a credit card. The caller did not identify ESI or EPI.

3

4   85. Plaintiff subsequently received two tubs of "Activator 1000". The invoice was from EPI INC. Invoice 478272 stated a price of $199.90, deducted a $10 discount, and added $5 for shipping. The tubs identified "Environmental Products International". There was also a brochure from JOSEPH CARNEY and ENVIRONMENTAL SAFETY INTERNATIONAL INC. Nothing indicated a company name of Activator 1000.

5

6

7

8   86. On September 25, 2009, plaintiff sent a cancellation letter with inside address Joseph Carney, Environmental Protection [sic] International, P. O. Box 397, Fairview, NJ  07022-0397 and asked for a return shipping address. Plaintiff corrected the address on the envelope to ENVIRONMENTAL PRODUCTS INTERNATIONAL by hand before sending it.

9

10

11

12   87. On October 2, 2009, plaintiff received an envelope from P. O. Box 397, Fairview, NJ 07022; although the envelope had a printed return address, no company name was given: just the P.O. Box address. The envelope contained a UPS mailing label to return the product.

13

14   88. Plaintiff subsequently drove to UPS STORE #2847 to return the product.

15   89. Plaintiff filed an FCC Form 1088 (Junk Faxes and Telemarketing). The filing was 09-T00443616.

16

17   *H. Demand Letter*

18   90. On September 25, 2009, Plaintiff sent a certified mail return-receipt requested demand letter to JOSEPH CARNEY and SEAN CARNEY, ENVIRONMENTAL PRODUCTS INTERNATIONAL INC., P.O. BOX 397, FAIRVIEW, NJ. The inside address was to Environmental Protection [sic] International, but the address on the envelope was corrected to ENVIRONMENTAL PRODUCTS INTERNATIONAL. The Post Office delivered the letter on September 28, 2009.

19

20

21

22   91. Although plaintiff received a return shipping label mentioned above, Defendants did not otherwise respond to plaintiff.

23

24   92. Plaintiff specifically demanded that his telephone number, 650-948-1790, be placed on the company specific do-not-call list.

25   93. Plaintiff specifically demanded a written copy of the do-not-call policy per 47 C.F.R. §

14

64.1200(d)(1).  A written copy of the do-not-call policy was not provided.

94.  The CARNEYs and ESI did not offer any explanation or remedy for the call within 30 days.

### I.  Subsequent Call

95.  On 6 April 2011, plaintiff received a live call (the "fifth call").  The Caller ID for this call was "Out of area" with no telephone number.  The caller, "Tom" with "Septic Care", knew plaintiff had previously purchased and returned Activator 1000.  Such knowledge shows inside information of the 2009 sale of Activator 1000 to plaintiff; the caller knew not only of the purchase but also the return.  An outsider might guess about a previous purchase, but guessing about a return is unlikely.  The information thus links the call to ESI's data.  Tom offered plaintiff a three year supply of "Activator 2000" for $134.  Plaintiff stated that he did not remember the previous company being Septic Care; plaintiff was told it was the same company.  Plaintiff complained to the caller that he was on the company's do-not-call list.  Plaintiff asked the caller for a telephone number or address, but the caller would not supply one.

96.  During the call, plaintiff made another do-not-call request and demanded a written copy of the do-not-call policy.  A written copy of the do-not-call policy was not provided.

### J.  Conduct

97.  Defendants' conduct is despicable.  Despite actions by Oregon, Missouri, Wisconsin, and the FCC, Defendants continued to use unlawful telemarketing practices years later.

98.  Defendants' conduct meets the definition of "malice" under California Civil Code § 3294.  Defendants knew that prerecorded telephone solicitations without prior consent were injuries to the recipient.  Despite notice and knowledge, Defendants willfully and consciously disregarded the rights of others.

99.  Defendants' conduct meets the definition of "oppression" under California Civil Code § 3294.  Defendants consciously disregarded the telemarketing laws and subjected persons to interruptions from their daily lives to answer telephone calls that should never have been made.

100.  Defendants' conduct meets the definition of "fraud" under California Civil Code § 3294.  Defendants intentionally concealed their identity.  Honest advertisers want consumers to know their name; they do not hide their identity or block Caller ID.  Suppressing an advertiser's identify makes it difficult for consumers to exercise their legal rights.  Defendants did not provide company names or telephone numbers making it difficult to identify the caller and prosecute.  On information and belief, Defendants use a variety of names in order to escape telemarketing restrictions.  The FCC NAL ¶ 8

15

states, "ESI asserts that we should rescind our proposed forfeiture because it no longer does business under the name 'Septic Safety' ...."

## V. <u>FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS</u>

### Violation of the Telephone Consumer Protection Act (TCPA. 47 U.S.C. § 227(b))

101.  Plaintiff realleges and incorporates the allegations of paragraphs 1 through 100 as though fully set forth herein.

102.  Congress passed the Telephone Consumer Protection Act (TCPA, 47 U.S.C. § 227(b)) to protect consumers from certain automated calls.  For example, Congress prohibited advertisers from using prerecorded telephone messages for unsolicited advertisements without the subscriber's prior express consent. (47 U.S.C. § 227(b).)

103.  Congress granted a private right of action ("PROA") to consumers at 47 U.S.C. § 227(b)(3). Violations of the subsection and its FCC regulations are actionable under the TCPA. (47 U.S.C. § 227(b)(3)(A).)

104.  The prerecorded call on September 14, 2009, violated 47 U.S.C. § 227(b)(1)(B).  It was an unsolicited advertisement transmitted without prior express consent.

105.  Defendants' history shows they knew prerecorded solicitations were illegal, and the calls suppressed identification information, so the violations are "knowing" or "willful" in the language of the TCPA.

106.  Defendants are guilty of oppression, fraud, and/or malice as defined by Civil Code § 3294. Despite continued notices from the FCC and other government entities, Defendants continued to violate telemarketing laws and consciously ignore the rights of residential telephone subscribers.

## VI.   <u>SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS</u>

### Violation of the Telephone Consumer Protection Act (TCPA. 47 U.S.C. § 227(c))

107.  Plaintiff realleges and incorporates the allegations of paragraphs 1 through 100 as though fully set forth herein.

108.  Congress wrote 47 U.S.C. § 227(c) for the "Protection of subscriber privacy rights".  Congress told the FCC to write regulations "concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." (47 U.S.C. § 227(c).)

Consumers object to receiving calls that do not identify the caller, do not provide caller ID, or do not follow do-not-call procedures. Violations of the FCC regulations are actionable under the TCPA. (47 U.S.C. § 227(c)(5)(A).)

109. Congress made the advertiser responsible for the actions of its telemarketers ("by or on behalf of"; see 47 USC § 227(c)).

110. Many of the FCC's subsection 227(c) regulations are found at 47 C.F.R. § 64.1200(c) [2007], 47 C.F.R. § 64.1200(d) [2007], and 47 C.F.R. § 64.1601(e).

111. 47 C.F.R. § 64.1200(d) applies to any person or entity initiating "any call for telemarketing purposes to a residential telephone subscriber". The term "telemarketing" is defined at 47 C.F.R. § 64.1200(f)(10) [2007] states "The term telemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."

### 1.  Identification

112. 47 C.F.R. § 64.1200(d)(4) [2007] states, "*Identification of sellers and telemarketers.*  A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted."

113. The prerecorded call on 14 September 2009 (first call) did not provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call was made, or a telephone number or address at which the person may be contacted. The call was to encourage the sale of a septic tank treatment. It did not provide any company name or telephone number; it should have identified the ultimate seller: ESI or EPI.

114. The live call on 15 September 2009 (second call) did not identify the entity on whose behalf the call was made. The call was to encourage the sale of a septic tank treatment. The call claimed the company was "Activator 1000", but the seller turned out to be ESI or EPI.

115. The live call on 15 September 2009 (fourth call) did not identify the entity on whose behalf the call was made. The call was to encourage the sale of a septic tank treatment by confirming a shipping address and getting payment. The caller did not identify ESI or EPI.

116. The live call on 6 April 2011 (fifth call) refused to supply a telephone number and refused to supply an address. The call was to encourage the sale of a septic tank treatment.

First Amended Complaint for Damages and Injunctive Relief

### 2. Written do-not-call policy

117.  47 C.F.R. § 64.1200(d)(1) [2007] states, "*Written policy*.  Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list."

118.  In his September 25, 2009 demand letter, Plaintiff demanded a written copy of a do-not-call policy but did not receive one.

119.  During the April 2011 call (fifth call), plaintiff demanded written copy of the do-not-call policy but did not receive one.

### 3. Do-not-call request

120.  47 C.F.R. § 64.1200(d)(6) [2007] states, "*Maintenance of do-not-call lists*.  A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls.  A do-not-call request must be honored for 5 years from the time the request is made."

121.  The April 2011 call (the fifth call) did not honor plaintiff's do-not-call request.

### 4. Caller ID

122.  47 C.F.R. § 64.1601(e) [2003] states, "Any person or entity that engages in telemarketing, as defined in section 64.1200(f)(7) must transmit caller identification information."  "The telephone number so provided must permit any individual to make a do-not-call request during regular business hours."

123.  The prerecorded call on 14 September 2009 (first call) did not supply a valid telephone number for its Caller ID information.

124.  The live call on 6 April 2011 (fifth call) did not supply a valid telephone number for its Caller ID information.

### 5. Standing

125.  The subsection (c) private right of action has a standing requirement.  Plaintiff has received more than one call in violation of subsection (c) within 12 months.  For example, plaintiff received three calls in September 2009 that did not identify the seller as required by 47 C.F.R. § 64.1200(d)(4).

126.  Defendants knew prerecorded solicitations were illegal, so the violations are "knowing" or "willful" in the language of the TCPA.

First Amended Complaint for Damages and Injunctive Relief

1   127.  Defendants are guilty of oppression, fraud, and/or malice as defined by Civil Code § 3294.

2   Despite continued notices from the FCC and other government entities, Defendants continued to violate

3   telemarketing laws and consciously ignore the rights of residential telephone subscribers.

4   ## VII.   THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS

5   ### Unfair Business Practices (Business & Professions Code §§ 17200 et seq.)

6   128.  Plaintiff realleges and incorporates the allegations of paragraphs 1 through 100 as though fully

7   set forth herein.

8   129.  Plaintiff has been injured in fact by defendants' unfair business practices.  Plaintiff received an

9   illegal prerecorded call.  Furthermore, plaintiff has lost money or property as a result of those practices.

    Plaintiff has lost money by sending a certified letter required by the CLRA; plaintiff lost gasoline

10  driving to the UPS store; plaintiff never received a written copy of a do-not-call policy.  Plaintiff has

11  standing under Business & Professions Code § 17204.

12  130.  Defendants' telemarketing practices violate the TCPA.

    131.  Defendants' marketing practices violate the CLRA.

13  132.  Defendants' marketing practices violate the California Unfair Advertising Practices Act.

14  133.  Defendants' telemarketing practices violate Pubic Utilities Code § 2871 et seq.

15  134.  Telemarketers must provide valid Caller ID information.

16  135.  Plaintiff was not connected to a live sales agent within two seconds of answering the telephone

17  as required by the Telemarketing Sales Rule.

18  ## VIII.   FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

19  ### Unfair Advertising Practices (Business & Professions Code §§ 17500 et seq.)

20  136.  Plaintiff realleges and incorporates the allegations of paragraphs 1 through 100 as though fully

21  set forth herein.

22  137.  Plaintiff has been injured in fact by defendants' unfair business practices.  Plaintiff received an

23  illegal prerecorded call.  Furthermore, plaintiff has lost money or property as a result of those practices.

    Plaintiff has lost money by sending a certified letter required by the CLRA; plaintiff lost gasoline

24  driving to the UPS store; plaintiff never received a written copy of a do-not-call policy.  Plaintiff has

25  standing under Business & Professions Code § 17535.

19

138. Defendants' telemarketing practices violate Business & Professions Code § 17500.3. A caller must immediately identify who they are and state the true purpose of the call. The caller did not adequately identify. A caller must state who they are. A caller must state who he represents. A caller must state the kinds of goods or services being offered for sale. A caller may not use any plan, scheme, or ruse to misrepresent his true status or mission.

139. The identity information in the prerecorded message did not provide an actual company name, a telephone number, or an address.

## IX.   **PRAYER FOR RELIEF**

### A. *For the First and Second Causes of Action (TCPA)*

Plaintiff prays for injunctive relief.

Plaintiff prays for at least $500 in statutory damages for each violation of the TCPA or its regulations. Plaintiff prays that each violation be trebled because it was willful or knowing as defined in the TCPA.

Plaintiff claims there is at least one violation in one call of subsection (b), so subsection (b) statutory damages should be $1,500.

Plaintiff claims there at least nine violations of the TCPA during 4 telephone calls (the first, second, fourth, and fifth) and the demand letter, so the statutory damages should be 4 calls plus 1 letter for $7,500.

Plaintiff prays for exemplary damages according to proof. In the case of a default, plaintiff reserves $1,000,000 in exemplary damages.

Under a *BMW v Gore* guideline, first strike punitive damages may be similar to penalties levied by government agencies. The FCC is authorized to impose $16,000 for each violation of the TCPA. In that case, reasonable exemplary damages for ten violations would be $160,000. This case is not a first strike situation: the Defendants have already been subject to actions by an Attorney General and the FCC. Those actions were not an adequate deterrent; years later the Defendants are still violating the same telemarketing statutes. The exemplary damages should be much more; confiscating all profit from the venture would be appropriate.

*United Artists Theatre Circuit v. F. C. C.*, 147 F.Supp.2d 965, shows that only one subscriber in 90,000 bothered to sue under the TCPA telemarketing rules. If lawsuits are rare, then some companies

First Amended Complaint for Damages and Injunctive Relief

(or their telemarketers) may risk such lawsuits believing the financial liability is small.  For example, paying one $2,500 judgment every 90,000 calls is an average cost of 2.7 cents per call.  The rare lawsuit would be a small cost of doing business.

If a telemarketer used the required live operators to introduce the call, then each call would incur labor costs for the introduction.  If the operators got $18 per hour and the introductions took one minute (about 150 words), then each call requires $0.30 of labor.  In 90,000 calls, the telemarketer would save $27,000 worth of labor costs.

Punitive damages should be set to make illegal telemarketing practices uneconomic.  The penalty, when averaged over 90,000 calls, should be more than the economic savings of illegal automated telemarketing.

### B. For the Third Cause of Action (Unfair Business Practices)

Plaintiff prays for injunctive relief.

### C. For the Fourth Cause of Action (Unfair Advertising)

Plaintiff prays for injunctive relief.

### D. Further Prayer

Court costs, costs of action, and ~~attorney's fees~~.  (Struck by court order.)

Plaintiff prays for any other relief that the court deems proper.

## X. JURY DEMAND

A jury trial is requested.

## XI.   VERIFICATION

I, Gerald Roylance, am Plaintiff in the above-entitled action.  I have read the foregoing Complaint and know the contents thereof.  The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe them to be true.

First Amended Complaint for Damages and Injunctive Relief

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed at Mountain View, California.

Dated May 6, 2014

_____
Gerald Roylance

22